


UNITED STATES DISTRICT COURT

for the

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MALBERT RICH ) | |
| ) | |
| Plaintiff ) | CIVIL ACTION NO.: CV16 3301 |
| ) | |
| V. ) | |
| ) | |
| THE WASHINGTON POST and Their ) | DEMAND FOR JURY TRIAL |
| Predecessor, Successors, agents and/or ) | |
| Assigns ) | ROSS, J. |
| ) | |
| Defendant ) | |

## COMPLAINT

BLOOM, M.J.

Plaintiff, at this time *pro se*, states, upon information and belief, as follows:

### Introduction, Jurisdiction, and Venue

#### Introduction

1. The Defendant, The Washington Post, is an international newspaper headquartered in Washington, D.C. The Washington Post is viewed in paper form and via the internet by hundreds of thousands of readers around the world.

2. That on January 16, 2015 the Washington Post published an article entitled 'First Lawsuit in Metro Incident Filed' (the 'article'). The article appeared on page B2 of the newspaper's Metro section. The article was written by Paul Duggan. Paul Duggan was a reporter and employee of the Washington Post at the time of the publication of this article. The words of the original article survives in its entirety on the Defendant's website as 'Metro to Face Passenger Lawsuit After Riders Were Trapped in Smoke-Filled Train' - posted date - January 15, 2015.

1

3.     That upon Plaintiff's release from Medstar Georgetown University Hospital January 15, 2015, Plaintiff answered questions from reporters for ten minutes about a January 12, 2015 tragic train incident that killed one person and had him and over eighty others hospitalized.

4.     That in the center of the article under Duggan's byline, the Plaintiff is pictured sitting at a conference table wearing a dour, unflattering expression, appearing angry, menacing. There were hundreds of pictures taken during the ten minute conference for Duggan to choose from.

5.     That Duggan begins the article by discussing the deadly calamity that occurred January 12, 2015 aboard a smoke-filled Washington D.C Metro train which the Plaintiff and others described. After Dugan discussed events that occurred aboard the train where passengers were trapped in thick smoke for approximately 45 minutes, Duggan shifted his focus from the events of that tragic day to impeaching this Plaintiff's honesty and integrity by writing:

> "A review of court records shows that Mr. Rich has a conviction history in Virginia involving numerous motor-vehicle related offenses from 2001 to 2007, including several guilty findings and jail terms for driving under the influence of intoxicating substances."

The article continues without interruption with Duggan stating,

> "In 2011 he filed a negligence lawsuit in federal court in Virginia alleging he had injured his back outside the Spotsylvania Town Centre Mall after slipping on an 'extremely slick surface' where construction work was underway. According to that complaint, filed on his behalf by a different attorney, Rich became dependent on painkillers. The lawsuit, which court records show was dismissed, said that Rich was trying to wean himself off opiates and muscle relaxers, and restore himself to his prior, active opiate-free life."

6.     Duggan's article was published nationally and internationally by the Washington Post and paints the Plaintiff as a drug-addicted criminal who files and loses frivolous lawsuits in an

2

attempt to, apparently, scam money. During the above-mentioned news conference Duggan shouted, "How much you trying to get," at the Plaintiff. Over 20 stories came out of that brief news conference. Duggan's article was the only that personally attacked the Plaintiff.

7. This Plaintiff has had numerous convictions for DWI, but what is the charge Duggan alleges as Driving under the influence of intoxicating substances? Is there such a charge? And how does having a prior history of motor-vehicle related issues or past alcohol abuse impact on anything related to the filing of a lawsuit after being hospitalized after a tragic event?

8. The Plaintiff did not file and lose a frivolous slip and fall lawsuit, as Duggan alludes to in the article when he states "court records show the case was dismissed." That statement is false and misleading. The lawsuit which Duggan refers to where Plaintiff injured his back was settled prior to trial, not dismissed for lack of substance as Duggan suggests. All lawsuits that reach a mutual settlement are thereafter dismissed. Also, the back injury persists and to this day the Plaintiff continues various alternative treatments to avoid or minimize the use of painkillers or any other medication, which is a reasonable act, but an act Duggan twists to portray Plaintiff in the worst light possible. The Plaintiff simply used medications as prescribed by his physician, always with the goal of reducing intake. And regarding the DWIs, the Plaintiff has addressed those issues through New York City's Lawyer Assistance Program, which those same court documents on which Duggan relied, showed. That information was available to him.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter since the amount in controversy exceeds $75,000 and diversity of citizenship exists between the Defendants (Washington, D.C.) and the Plaintiff, a Queens, New York resident.

10. This New York Court has personal jurisdiction over the Defendant since the Washington Post directly markets, advertises, and undertakes and engages in other systematic conduct and activities to attract readers in New York, locally, as well as readers both nationally and internationally. Indeed, the Washington Post is one of the most read newspapers in the world both in paper form and electronically.

11. Venue is proper since the Defendant, her agents and assigns markets and does business with New York residents and has a New York office, and Plaintiff resides in New York and where he is currently studying for the New York February 2016 Bar Examination.

## THE PARTIES

### Plaintiff

12. The Plaintiff's primary residence is 144-07 227th Street, Rosedale, N.Y. The Plaintiff is a writer, and lives part of the year in Fredericksburg, Virginia.

### Defendants

13. The Defendant, The Washington Post, is an international newspaper headquartered in Washington, D.C. at One Franklin Square located at 1301 K Street, NW, Washington, D.C. 20003. The Defendant has offices around the world, and in New York at 251 W.57th St., Suite 20, New York, NY 10019.

## COUNT ONE - DEFAMATION

14. The Defendant's employee, Paul Duggan, in the above-mentioned article wrote false statements that were defamatory 'on its face' and defamatory by inuendo. These false statements whether made intentionally or negligently, adversely affected Plaintiff's reputation.

15. The Defendant, The Washington Post, employs Duggan and published the article containing false statements which was read by Plaintiff, Plaintiff's friends, family, associates -

4

both past and future, and employers - both past and future, and potentially millions of readers. The Plaintiff has been stopped on the street by many people and told, "...that article was messed up." Friends and family have had the same response. The defamatory article will exist in print, internet and other mediums for decades and even centuries to come.

16. Any reasonable person who read the article and saw the brooding picture accompanying the article would know that the defamatory remarks were addressing this Plaintiff.

17. This Plaintiff has suffered general, presumed damages, as well as special damages since most people that Plaintiff knew have read the article. It has been humiliating. The Defendant's libel is a continuing tort in that all future readers of the article or anyone doing a Google search of Plaintiff's name - such as a prospective employer, or client, or significant other can read these false and misleading statements, and reasonably conclude Plaintiff is an opiate-dependant, shifty, slick, dishonest criminal who files frivolous lawsuits, perhaps inferring he is too lazy to work.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a jury trial and judgment and damages against the Defendant, their predecessors and successors and assigns as follows:

(1) Compensatory damages in the amount of $375,000;

(2) Punitive damages in the amount of $375,000; and

(3) Any other relief to be determined by a jury.

Dated: January 16, 2016

By: _____
Malbert Rich, Pro Se
144-07 227th Street
Rosedale, NY 11413
mrich0319@gmail.com
718 723 0732
202 705 3322

5

# ATTACHMENT

# DEFAMATORY ARTICLE IN PRINT, AND INTERNET COPY

## Man describes the scene in the smoke-filled Yellow Line train

BY PAUL DUGGAN

Sixty-eight hours after Monday's Metro ordeal, in which scores of choking passengers were trapped on a smoke-filled subway train and one of them died, the legal fallout began at 11:30 a.m. Thursday in the offices of a personal-injury law firm.

There, the first lawsuit against the Washington Metropolitan Area Transit Authority was announced. Safe to say it won't be the last.

"The complaint that's going to be filed in the morning [Friday] is going to allege negligent maintenance, negligent inspection and a negligent response to an emergency situation," attorney Kim Brooks-Rodney said. She was referring to an electrical malfunction that caused the smoke in a Metro tunnel, according to federal accident investigators.

On Thursday, facing a bevy of reporters and a half-dozen TV news cameras at the Washington offices of Cohen & Cohen, where she is a partner, Brooks-Rodney stood in the crowded conference room and said: "To my right is Mr. Malbert Rich. He was a passenger on the Yellow Line train on Monday. Mr. Rich is just out of the hospital."

Rich, 53, is Cohen & Cohen's Plaintiff No. 1, with many more potential litigants lining up, Brooks-Rodney said. In addition to the woman who died, 83 riders sickened by smoke were taken to hospitals. "You should know that we have approximately 20 appointments with other potential clients," Brooks-Rodney told the gathering. "And calls continue to come in."

After the Virginia-bound train stopped abruptly in the tunnel, about 800 feet south of the L'Enfant Plaza station, and the lights went out in the six cars, frightened riders were stuck for at least 35 minutes, gasping for air as they waited for help to arrive.

Carol Glover, 61, of Alexandria died of what the medical examiner's office said Thursday was acute respiratory failure due to smoke exposure.

Brooks-Rodney said in an interview that all she knows about the incident is what she has read and heard in the news media. She said she looks forward to learning more in the months ahead, after the National Transportation Safety Board finishes its investigation and she obtains documents from Metro and the D.C. government as part of the litigation.

"We know the problem was electrical arcing," she said at the news conference, repeating what the NTSB has disclosed. Investigators and Metro officials have offered almost no additional details about the incident. "What we don't know is why the problem happened," Brooks-Rodney said. "And we don't know why there was such a slow response."

She said the lawsuit will be filed in D.C. Superior Court.

Rich, who said he is a writer and has residences in Fredericksburg and [illegible], stood beside the lectern and was wearing a wristband from MedStar Georgetown University Hospital. Because her client had not yet fully recovered, Brooks-Rodney said in introducing him, that "he will take only a very few questions from all of you."

Rich then stood and spoke in a strong, clear voice for nine minutes, often in animated tones, until Brooks-Rodney interrupted, saying, "Let's let him rest at this point."

A review of court records shows that Rich has a conviction history in Virginia involving numerous motor-vehicle offenses from 2001 to 2007, including several guilty findings and jail terms for driving under the influence of intoxicating substances.

In 2011, he filed a negligence lawsuit in federal court in Virginia, alleging that he had injured his back outside the Pennsylvania Towne Center mall after slipping on "an extremely slick surface" where construction work was under way.

According to that complaint, filed on his behalf by a different attorney, Rich became dependent on painkillers. The lawsuit, which court records show was dismissed, said that Rich was trying to "wean himself off opiates and muscle relaxers, and, if possible, restore himself to his prior active, opiate-free life."



Malbert Rich, left, a passenger on the smoky Metro train that stopped in a tunnel Monday, with attorney Kim Brooks-Rodney.

ANDREW HARNIK FOR THE WASHINGTON POST

Asked about Rich's background, Brooks-Rodney said in a statement after the news conference: "I represent people who have been injured as a result of another's negligence. I do not refuse to represent a person because they may have a criminal past."

Rich's account of his ordeal on the train echoed many others this week. While he and his fellow riders waited for firefighters to arrive, he said, "you had a lot of passengers crying, cursing at the staff. Some were praying loudly. After about 10 minutes of that, I actually texted my mother and my two children, my final message to them."

He said: "It was so surreal. I told my mother that I loved being her son. I told my kids I loved being their dad. I told them to go on. I didn't see any way that we were going to get out of there."

Although they were angry, most passengers remained calm, with some passing water bottles to one another. "One lady, after all the water was gone, actually opened a wine bottle and passed it around," he said, adding, "There were a lot of people, after about a 20-minute period, that were seizing, have seizures."

Rich said he was "coughing profusely, like everybody else," until rescuers arrived and led the riders out of the tunnel. "There was no havoc" during the evacuation. "There was no animosity. After everybody got their screaming out, it was about how do we survive. There was no pushing, no shoving. People were giving each other room."

He called it "a story of human kindness, of human will."

Then his attorney said he should be quiet and save his strength.

Brooks-Rodney, who was an assistant general counsel at Metro from 1988 to 1993, was involved as a plaintiff's attorney after the Red Line crash that killed eight riders and a train operator in 2009. She said she obtained a "confidential settlement" for the family of retired Maj. Gen. David F. Wherley Jr. of the D.C. Air National Guard and his wife, Ann, who both died in the crash.

As for the forthcoming litigation [illegible]:

The goal of this lawsuit is to improve the subway system, she declared.

As for the financial awards that might also result: "We are still evaluating the case, so I can't speak to what the compensation might be for anyone."

paulduggan@washpost.com

# The Washington Post

Transportation

# Metro to face passenger lawsuit after riders were trapped in smoke-filled train

By Paul Duggan  January 15, 2015

Sixty-eight hours after Monday's Metro ordeal, in which scores of choking passengers were trapped on a smoke-filled subway train and one of them died, the legal fallout began at 11:30 a.m. Thursday in the offices of a personal-injury law firm.

There, the first lawsuit against the Washington Metropolitan Area Transit Authority was announced. Safe to say it won't be the last.

"The complaint that's going to be filed in the morning [Friday] is going to allege negligent maintenance, negligent inspection and a negligent response to an emergency situation," attorney Kim Brooks-Rodney said. She was referring to an electrical malfunction that, according to federal accident investigators, caused the smoke in a Metro tunnel.

On Thursday, facing a bevy of reporters and a half-dozen TV news cameras at the Washington offices of Cohen & Cohen, where she is a partner, Brooks-Rodney stood in the crowded conference room and said: "To my right is Mr. Malbert Rich. He was a passenger on the Yellow Line train on Monday. Mr. Rich is just out of the hospital."

Rich, 53, is Cohen & Cohen's Plaintiff No. 1, with many more potential litigants lining up, Brooks-Rodney said. In addition to the woman who died, 83 riders sickened by smoke were taken to hospitals. "You should know that we have approximately 20 appointments with other potential clients," Brooks-Rodney told the gathering. "And calls continue to come in."

After the Virginia-bound train stopped abruptly in the tunnel, about 800 feet south of the L'Enfant Plaza station, and the lights went out in the six cars, frightened riders were stuck for at least 35 minutes, gasping for air as they waited for help to arrive.

Carol Glover, 61, of Alexandria died of what the D.C medical examiner's office said Thursday was acute respiratory failure due to smoke exposure.

Brooks-Rodney said in an interview that all she knows about the incident is what she has read and heard in the news media. She said she looks forward to learning more in the months ahead, after the National Transportation Safety Board finishes its investigation and she obtains documents from Metro and the D.C. government as part of the litigation.

"We know the problem was electrical arcing," she said at the news conference, repeating what the NTSB has disclosed. Investigators and Metro officials have offered almost no additional details about the incident. "What we don't know is why the problem happened," Brooks-Rodney said. "And we don't know why there was such a slow response."

She said the lawsuit will be filed in D.C. Superior Court.

Rich, who said he is a writer and has residences in Fredericksburg, Va., and New York City, sat beside the lectern and was wearing a wristband from MedStar Georgetown University Hospital. Because her client had not yet fully recovered, Brooks-Rodney said in introducing him, that "he will take only a very few questions from all of you."

Rich then stood and spoke in a strong, clear voice for nine minutes, often in animated tones, until Brooks-Rodney interrupted, saying, "Let's let him rest at this point."

A review of court records shows that Rich has a conviction history in Virginia involving numerous motor-vehicle offenses from 2001 to 2007, including several guilty findings and jail terms for driving under the influence of intoxicating substances.

In 2011, he filed a negligence lawsuit in federal court in Virginia, alleging that he had injured his back outside the Spotsylvania Towne Centre mall after slipping on "an extremely slick surface" where construction work was underway.

According to that complaint, filed on his behalf by a different attorney, Rich became dependent on painkillers. The lawsuit, which court records show was dismissed, said that Rich was trying to "wean himself off opiates and muscle relaxers, and, if possible, restore himself to his prior active, opiate-free life."

Asked about Rich's background, Brooks-Rodney said in statement after the news conference: "I represent people who have been injured as a result of another's negligence. I do not refuse to represent a person because they may have a criminal past."

Rich's account of his ordeal on the train echoed many others' this week. While he and his fellow riders waited for firefighters to arrive, he said, "you had a lot of passengers crying, cursing at the staff. Some were praying loudly. After about 10 minutes of that, I actually texted my mother and my two children, my final message to them."

He said: "It was so surreal. I told my mother that I loved being her son. I told my kids I loved being their dad. I told them to go on. I didn't see any way that we were going to get out of there."

Although they were angry, most passengers remained calm, with some passing water bottles to one another. "One lady, after all the water was gone, actually opened a wine bottle and passed it around," he said, adding, "There were a lot of people, after about a 20-minute period, that were seizing, have seizures."

Rich said he was "coughing profusely, like everybody else," until rescuers arrived and led the riders out of the tunnel. "There was no havoc" during the evacuation. "There was no animosity. After everybody got their screaming out, it was about how do we survive. There was no pushing, no shoving. People were giving each other room."

He called it "a story of human kindness, of human will."

Then his attorney said he should be quiet and save his strength.

Brooks-Rodney, who was an assistant general counsel at Metro from 1988 to 1993, was involved as a plaintiffs' attorney after the Red Line crash that killed eight riders and a train operator in 2009. She said she obtained a "confidential settlement" for the family of retired Maj. Gen. David F. Wherley Jr. of the D.C. Air National Guard and his wife, Ann, who both died in the crash.

As for the forthcoming litigation, she said it has a noble purpose.

"The goal of this lawsuit is to improve the subway system," she declared.

As for the financial awards that might also result: "We are still evaluating the case, so I can't speak to what the compensation might be for anyone."

Paul Duggan covers the Metro system and transportation issues for The Washington Post.